778 A.2d 638

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Matthew SAMUELS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 8, 2001.

Decided Aug. 28, 2001.

Steven C. Leach, Drexel Hill, for appellant.

Louis Gary Stesis, Media, for appellee.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

This appeal from a conviction for homicide by vehicle while driving under the influence of alcohol raises the issue of the state of mind necessary to support a conviction of that offense. Appellant maintains that criminal negligence as defined in the crimes code is required and that the trial court erred in failing to give a jury instruction to that effect, as he requested.

The record contains the following evidence. On February 26, 1997, appellant was drinking copiously[1] in a bar with friends when James DiAmicis and friends entered. Mr. DiAmicis greeted appellant's date, whom he knew, angering appellant and leading to a minor confrontation. When appellant left the bar, he and a couple of his friends waited outside until Mr. DiAmicis left later with one of his friends. Appellant drove his pickup truck across the parking lot into the car of DiAmicis's friend, then reversed his vehicle and headed for the exit. As he drove out, he changed direction to run over Mr. DiAmicis, killing him, then washed his truck at a car wash. The next morning at work, appellant borrowed a

---

1. There was testimony that appellant drank at least ten or twelve vodka mixed drinks as well as about half of a fifth of tequila on the evening in question.

coworker's car and fled to Colorado where he was apprehended two months later on a fugitive warrant and returned to Pennsylvania.

In May, 1998, a jury convicted appellant of involuntary manslaughter, driving under the influence (DUI), homicide by vehicle while DUI, and accident involving death or bodily injury.[2] He received an aggregate sentence of five to eleven years. Superior Court affirmed. We allowed the appeal in order to consider whether the trial court erred in denying appellant's requested charge on criminal negligence as it pertains to the offense of homicide by vehicle while DUI.

To support his position that the offense of homicide by vehicle while DUI is not a strict liability offense but rather requires proof of criminal negligence—that is, ignoring a substantial and unjustifiable risk and involving a gross deviation from the standard of care that a reasonable person would observe in the circumstances—appellant relies on *Commonwealth v. Heck*, 517 Pa. 192, 535 A.2d 575 (1987). The Commonwealth, on the other hand, relies on *Commonwealth v. McCurdy*, 558 Pa. 65, 735 A.2d 681 (1999), wherein this court stated that the offense of homicide by vehicle while DUI requires (1) a conviction of DUI pursuant to 75 Pa.C.S. § 3731 and (2) proof that the violation caused the death, neither of which requires a showing of negligence. The Commonwealth therefore concludes that appellant was not entitled to a jury instruction on criminal negligence, there was no trial error, and the judgment of sentence should be affirmed. Contrary to the Commonwealth's contentions, however, *McCurdy* does not mandate a different conclusion as the issue in that case did not involve the applicable mens rea requirement for vehicular homicide offenses.[3]

**2.** 18 Pa.C.S. § 2504 and 75 Pa.C.S. §§ 3731, 3735, and 3742 respectively.

**3.** The issue in *McCurdy* was whether the constitutional infirmity of 75 Pa.C.S. § 3731(a)(5) undermined the driver's conviction under § 3731(a)(1), and did not implicate the specific issue presented in this case, the minimum level of culpability under § 3735.

Appellant argues that *Heck*, by analogy, supports his position. In *Heck*, this court addressed a related issue where the offense was homicide by vehicle (not DUI related), 75 Pa.C.S. § 3732. Explicitly, that statute, like the one at issue here, requires only that the death be caused unintentionally. We held, however, that the minimum level of culpability is criminal negligence, stating that *Commonwealth v. Field*, 490 Pa. 519, 417 A.2d 160 (1980), had already established that 75 Pa.C.S. § 3732 was not a strict liability offense and that 18 Pa.C.S. § 302 establishes criminal negligence as the minimum level of culpability.[4]

The logic of appellant's argument is sound. The motor vehicle code, 75 Pa.C.S. § 3732, defines vehicular homicide, the offense at issue in *Heck*, as follows: "Any person who unintentionally causes the death of another person while engaged in the violation of any [motor vehicle law except DUI] is guilty of homicide by vehicle, a misdemeanor of the first degree, when the violation is the cause of death." The basis of appellant's conviction, 75 Pa.C.S. § 3735(a), DUI-related vehicular homicide, states: "Any person who unintentionally causes the death of another person as the result of a violation of section 3731[DUI] is guilty of a felony of the second degree when the violation is the cause of death...." The material language is identical. If we adhere to the rationale of *Heck*, it would follow that 75 Pa.C.S. § 3735 requires proof of criminal negligence.

■ Although the trial court may have erred by refusing to charge the jury that criminal negligence is the culpability requirement for the offense of DUI-related vehicular homicide, any error in this regard is harmless in this case and a new trial is not warranted.

■ Under the harmless error doctrine, we will affirm the judgment of sentence in spite of error by the trial court if we

---

4. *Field* analyzed § 3732 pursuant to a due process challenge based on the law of the land clause of Article I, section 9 of the Constitution of Pennsylvania. *See Commonwealth v. Koczwara*, 397 Pa. 575, 155 A.2d 825, 830 (1959); *Commonwealth v. Field*, 417 A.2d at 164 (Flaherty, J., concurring).

conclude beyond a reasonable doubt that the error did not contribute to the jury's verdict. *Commonwealth v. Wright,* 560 Pa. 34, 742 A.2d 661 (1999). The trial court's refusal to charge on criminal negligence as an element of homicide by vehicle—DUI-related could not have contributed to the jury's verdict as the court charged the jury on criminal negligence as it pertained to the involuntary manslaughter charge [5] and the jury convicted appellant of that offense. The jury's finding of guilt as to involuntary manslaughter necessarily included a finding of criminal negligence. Thus any error by the trial court in failing to charge the jury that criminal negligence was also required for the vehicular homicide charge is clearly harmless.[6]

Therefore we will affirm the judgment of Superior Court.

Judgment affirmed.

Justice SAYLOR files a concurring opinion.

Justice NEWMAN files a concurring and dissenting opinion in which Mr. Justice Castille joins.

SAYLOR, Justice, concurring.

This appeal provides the opportunity for the Court to reexamine its decisions in the area of *mens rea,* a core concept

---

**5.** In defining the offense of involuntary manslaughter, the trial court explained gross negligence as follows:

A Defendant's conduct is grossly negligent when he should be aware of a substantial and unjustifiable risk that death will result from his conduct. The risk being such that it is grossly unreasonable for him to fail to perceive—, that is, recognize the risk.... The Defendant should be aware of the risk—of such a risk even though he does not actually perceive it. The risk of death must be of such a nature and degree that the Defendant's disregard of the risk or failure to perceive it, considering the nature and extent of his conduct and the circumstances known to him, involves a gross deviation from the standard conduct or care that a reasonable person would observe in the Defendant's situation.

N.T., 5/22/98, at 73–74.

**6.** Moreover, unlike *Heck,* where the Commonwealth failed to present evidence of even the minimal level of culpability, in this case the Commonwealth presented evidence that appellant changed the direction of his vehicle in order to run over the victim, killing him, washed his truck at a car wash, then fled the jurisdiction.

of the criminal law. Like Madame Justice Newman, I do not believe that the General Assembly intended to require a specific finding of criminal negligence by a trier of fact to support a conviction for the offense of homicide by vehicle while driving under the influence. Careful review persuades me that the decisions relied upon by the majority in reaching a contrary conclusion are not supportable on their own accord for the reasons which follow.

## I. Background—*Mens Rea* and Strict Liability

The problem of determining the degree of culpability required to establish elements of criminal offenses in the absence of express legislative prescription has proved to be a difficult one for the courts.[1] The offense of homicide by vehicle/DUI, 75 Pa.C.S. § 3735, presents a particular challenge, as, for example, this Court's past expressions are divided concerning whether, on what basis, and to what extent criminal liability is intended to and may be imposed without regard to fault in the context of the predicate offense of driving under the influence, 75 Pa.C.S. § 3731 ("DUI"), including the extent to which such imposition would meet constitutional requirements. *See Commonwealth v. Mikulan,* 504 Pa. 244, 260, 470 A.2d 1339, 1347 (1983)(plurality).

Many jurisdictions hold that the offense of driving while intoxicated, as well as related offenses providing for more severe grading where actual harm results from a DUI, are intended to impose liability without requiring a specific finding that the defendant possessed a culpable state of mind.[2] Criminal liability in the absence of intention, belief, recklessness, or

1. *See generally* Dannye Holley, *Culpability Evaluations in the State Supreme Courts from 1977 to 1999: A "Model" Assessment,* 34 AKRON L.REV. 401 (2001)(reviewing the many expressions among state courts on the question of culpability where not specifically delineated by the legislature).

2. *See, e.g., State v. Johnson,* 130 N.M. 6, 15 P.3d 1233, 1239 (2000)(stating that "the public interest and potential harm posed by intoxicated drivers is so compelling that the [New Mexico] offense of DWI is a strict liability crime"); *State v. Glass,* 620 N.W.2d 146, 151 (N.D.2000)(North Dakota DUI); *State v. Ellenburg,* 283 Mont. 136, 938 P.2d 1376, 1377 (1997) (Montana DUI); *Albaugh v. State,* 721 N.E.2d 1233, 1236 (Ind. 1999)(Indiana DWI); *State v. Fogarty,* 128 N.J. 59, 607 A.2d 624, 628

negligence is generally termed strict or absolute liability. *See generally* Kenneth W. Simons, *When is Strict Criminal Liability Just?*, 87 J.Crim. L. & Criminology 1075, 1080 (Summ.1997).[3] Strict liability is unique in the criminal law, in that wrongful intent ordinarily is an element of a crime, this principle being embodied in the fundamental concept of *mens rea. See United States v. Cordoba–Hincapie*, 825 F.Supp. 485, 489 (E.D.N.Y.1993)(Weinstein, J.)(explaining that "[t]he term, *'mens rea,'* meaning 'a guilty mind; a guilty or wrongful purpose; a criminal intent,' is a shorthand for a broad network of concepts encompassing much of the relationship between the individual and the criminal law").[4] Because of this intrinsic connection between culpability and condemnation, statutes

(1992)(New Jersey DWI); *State v. Olmstead*, 310 Or. 455, 800 P.2d 277, 281 (1990)(Oregon DUII); *People v. Garner*, 781 P.2d 87, 89 (Colo.1989)(Colorado vehicular homicide); *State v. Freeman*, 31 N.C.App. 93, 228 S.E.2d 516, 519 (1976); *State v. Creamer*, 26 Kan. App.2d 914, 996 P.2d 339, 343 (2000)(Kansas involuntary manslaughter/DUI); *Reidweg v. State*, 981 S.W.2d 399, 407 (Tex.App.1998)(Texas intoxication manslaughter). *See generally* Annotation, *Validity, Construction, and Application of Statutes Directly Proscribing Driving With Blood–Alcohol Level in Excess of Established Percentage*, 54 A.L.R.4th 149 § 3(d) (2000); Annotation, *Alcohol–Related Vehicular Homicide: Nature and Elements of Offense*, 64 A.L.R.4th 166, §§ 44–54 (2000) (collecting cases); *State v. Hubbard*, 751 So.2d 552, 563 (Fla.1999)(indicating that "the notion that the State would have to prove the additional element of negligence appears to be an alien concept in this species of unintended crime"); Lawrence Taylor, Drunk Driving Defense 7 (1991)("[i]ntent is another aspect of drunk driving that should be clearly understood: None is required"); Donald H. Nichold, Drinking/Driving Litigation § 2.12 (Clark Boardman Callaghan 1996)(stating that *mens rea* "is not an element of the criminal drinking/driving offense as it is in most other criminal offenses[;] ... [o]ther related crimes, such as vehicular homicide or traffic violations which occur when the driver is under the influence o[f] intoxicants, have been referred to as strict liability or general intent crimes").

3. This definition, like many others in the law, is subject to qualification and elaboration. For example, a distinction is drawn between pure strict liability offenses, as to which no culpability is required as to any of the material elements of the offense, and impure strict liability, as to which culpability is required with respect to at least one material element but is not required as to others. *See generally* Simons, *When is Strict Criminal Liability Just?*, 87 J.Crim. L. & Criminology at 1081–82.

4. *See generally Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952)(describing the requirement of *mens rea* as "no provincial or transient notion[;] [i]t is as universal and persistent

imposing strict liability are not favored. *See generally Staples v. United States,* 511 U.S. 600, 605–06, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994); *Commonwealth v. Barone,* 276 Pa.Super. 282, 290, 419 A.2d 457, 462 (1980)(plurality)(describing a "strong common law tradition against strict penal responsibility"). Indeed, commentators have strongly suggested, and in some instances courts have held, that there are constitutional limitations upon the ability of the legislative branch to impose criminal liability without fault. *See Cordoba–Hincapie,* 825 F.Supp. at 505–06, 515–16 (reviewing federal jurisprudence on the subject and characterizing such as "uncertain" and "uneven").[5]

While the imposition of strict liability is disfavored and of questionable validity in some contexts, there are recognized exceptions. For example, it is widely accepted that the legis-

in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil"); *Cordoba–Hincapie,* 825 F.Supp. at 488 (characterizing as a "fundamental Anglo–American tradition that blameworthiness hinges upon a culpable state of mind"); *id.* at 505 (stating that *"mens rea* remains a reflection of the deep commitment within our culture regarding individual freedom and autonomy and the individual's relationship to the community").

**5.** In *Cordoba–Hincapie,* after setting forth a history of *mens rea* in the criminal law, from its origins through the modern view with extensive references to influential scholarly works, *see Cordoba–Hincapie,* 825 F.Supp. at 489–95, Judge (now Senior Judge) Jack B. Weinstein explained:

As the work of these leading authorities illustrates, the *mens rea* principle remains, in the modern criminal law, a fundamental requirement. Whatever the current application of the *mens rea* history, this brief recapitulation establishes a critical constitutional baseline. By the time the right to a jury trial and due process was embedded in the first amendment to the Constitution, *mens rea* constituted a fundamental protection against abuse of criminal sanctions by the state. It is a general rule of law that guards beliefs deeply held within our traditions of individual freedom, responsibility and duty. Like most ancient doctrines, however, it has grown far more sophisticated and nuanced than it once was. It can no longer simply be invoked. Its application must be carefully explained and its many distinctions must be considered. Not only has the law developed an appreciation of gradations in mental states, but it now also openly recognizes limited exceptions to a rule once characterized as admitting no compromise.

*Id.* at 495–96.

lative branch may impose absolute liability for "public welfare offenses" to promote the public welfare by enforcing compliance with regulatory schemes. *See Morissette*, 342 U.S. at 255, 72 S.Ct. at 246; *Commonwealth v. Koczwara*, 397 Pa. 575, 580, 155 A.2d 825, 827–28 (1959)("[s]uch so-called statutory crimes are in reality an attempt to utilize the machinery of criminal administration as an enforcing arm for social regulation of a purely civil nature, with the punishment totally unrelated to questions of moral wrongdoing or guilt"). The justification for the application of strict liability in this context includes the observation that penalties for regulatory offenses, as well as impact upon reputation, are generally minimal. *See id.*[6] A limited number of serious offenses, such as statutory rape and felony murder, have also been treated, in various jurisdictions, as entailing strict liability elements. *See generally Cordoba–Hincapie*, 825 F.Supp. at 497.[7] In many jurisdictions, as noted, it is also recognized that offenses analogous to Pennsylvania's homicide by vehicle, 75 Pa.C.S. § 3732, DUI, 75 Pa.C.S. § 3731, and homicide by vehicle/DUI, 75 Pa.C.S. § 3735, entail strict liability elements, *see supra* note 2, which, as further discussed below, does not square easily with the traditional justifications for the imposition of absolute liability and implicates concerns of constitutional dimension.

6. Mr. Justice (then Judge) Blackmun summarized the public welfare offenses doctrine as follows:

> From [the] cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir.1960)(Blackmun, J.).

7. The uneasiness of courts with strict liability offenses is perhaps illustrated in the statutory rape paradigm, where in various applications, many courts have permitted a defense of reasonable mistake of fact, although not otherwise afforded by the pertinent statutory scheme. *See Cordoba–Hincapie*, 825 F.Supp. at 497–98.

## II. The Present Interpretation of Sections 3732 and 3735 of the Vehicle Code as Embodying a Requirement of Criminal Negligence

Neither Section 3732 (homicide by vehicle) nor 3735 (homicide by vehicle/DUI) contains an express culpability element;[8] therefore, both are candidates for further examination to determine whether strict liability was intended, as many jurisdictions hold. The majority avoids such review, however, by divining from the statutes an intent requirement in the form of criminal negligence. Two sources of authority are offered in support of such requirement: 1) Section 302(a) of the Pennsylvania Crimes Code, derived from the Model Penal Code; and 2) the decisions of this Court concluding that a requirement of criminal negligence applies to the offense of homicide by vehicle, 75 Pa.C.S. § 3732. *See Commonwealth v. Field*, 490 Pa. 519, 417 A.2d 160 (1980); *Commonwealth v. Heck*, 517 Pa. 192, 535 A.2d 575 (1987). Although the majority's holding has the effect of avoiding difficult issues of statutory construction and, to a substantial degree, preempting questions of constitutional compliance associated with imposing absolute liability for such serious offenses, its inherent weakness is that neither the Crimes Code nor the cited

**8.** This was true prior to a recent amendment to Section 3732 which, as noted by Justice Newman, added an express culpability requirement. *See* Act of Dec. 20, 2000, P.L. 772, No. 108 § 1. Prior to such time, Section 3732 provided:

> Any person who unintentionally causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic except section 3731 (relating to driving under the influence of alcohol or controlled substance) is guilty of homicide by vehicle, a misdemeanor of the first degree, when the violation is the cause of death.

75 Pa.C.S. § 3732 (superseded). The phrase "except section 3731 (relating to driving under the influence of alcohol or controlled substance)" was added in 1982 to accommodate the new homicide by vehicle/DUI statute. *See* 75 Pa.C.S. § 3732, Historical and Statutory Notes. In addition to the insertion of a culpability requirement, the amendatory provisions also result in an enhanced gradation of the offense as a felony of the third degree. The analysis herein is primarily directed to the prior form of the statute, since the earlier version is the subject of the pertinent cases.

decisions provides persuasive support for the requirement of criminal negligence imposed.

## A. Section 302(a) of the Crimes Code and Associated Culpability Provisions

As the majority notes, Section 302(a) of the Crimes Code does, in fact, establish an elemental, minimum culpability requirement of criminal negligence in order to support a conviction for criminal offenses as a general rule.[9] However, the attachment of criminal negligence to individual offenses as a culpability element is closely limited. Indeed, Section 302 itself establishes a requirement of greater culpability, *recklessness*, as the default in instances in which the General Assembly has not specified culpability and no intent to impose absolute liability can be discerned. *See* 18 Pa.C.S. § 302(c).[10] Negligence, on the other hand, is treated as "an exceptional basis of liability," and is therefore generally excluded from the bases that will support culpability for an offense unless explicitly prescribed by the legislature. *See* MODEL PENAL CODE

9. Section 302(a) provides:

   **(a) Minimum requirements of culpability.**—Except as provided in Section 305 of this title (relating to limitations on scope of culpability requirements), a person is not guilty of an offense unless he acted intentionally, knowingly, recklessly, or negligently, as the law may require, with respect to each material element of the offense.
   18 Pa.C.S. § 302(a)

10. Section 302(c) provides:

    **(c) Culpability required unless otherwise provided.**—When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto.
    18 Pa.C.S. § 302(c). Significantly, unlike Section 302(a), Section 302(c) does not reference negligence, thus establishing recklessness as the general default requirement. The application of this default provision is subject to statutory exceptions, discussed below. In effect, these provisions represent a codification of the common law principle requiring *mens rea* in statutory crimes, even when the statutory definition does not so provide. *See generally* MODEL PENAL CODE § 2.05 cmt. at 283 (describing as "too fundamental to be compromised" the principle that "[c]rime does and should mean condemnation and no court should have to pass that judgment unless it can declare that the defendant's act was culpable").

§ 2.02 cmt. (Official Draft 1962).[11] Since neither Section 3732 nor 3735 of the Vehicle Code designates criminal negligence as a culpability standard, Section 302 of the Crimes Code simply does not supply this culpability requirement as an element of those offenses.

There is, however, a plausible argument to be made that other aspects of the Crimes Code's culpability scheme operate to supply the element of criminal negligence. To understand this line of reasoning, a closer review of the MPC culpability scheme, from which that of the Crimes Code is derived, is necessary.

In addition to supplying the default culpability provision of recklessness, the MPC places express and substantial constraints upon the application of strict or absolute liability to criminal offenses. Indeed, the MPC would expressly limit absolute liability offenses to "violations," *see* MODEL PENAL CODE § 2.05(1)(a), defined as infractions punishable by fine or forfeiture but not by any possible incarcerative sanction, *see id.* § 1.04(5),[12] as well as offenses defined by other statutes insofar as a legislative purpose to impose absolute liability plainly appears, *see id.* § 205(1)(b). Correspondingly, the MPC would reduce the grade of any offense defined by another statute, as to which absolute liability is imposed with respect to any material element, to a violation. *See id.* § 205(2)(a). The MPC nonetheless allows for the charging

---

**11.** The justification for restricting the application of negligence as a culpability element is that it reflects a lesser degree of fault than other recognized degrees of culpability. *See* P. Robinson & J. Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond,* 35 STAN. L.REV. 681, 695–96 & n. 7 (Apr.1983)(stating that "negligence refers to a state of unawareness"); *see also Cordoba–Hincapie,* 825 F.Supp. at 500 ("negligence does not represent an abandonment of the *mens rea* principle but rather its extension to include blame for the *absence* of a state of mind that, according to societal norms, the actor should have had" (citing Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 SUP.CT. REV. 107, 143–45 (1962)(emphasis in original))).

**12.** The MPC's default culpability scheme does not apply with respect to violations, *see* MODEL PENAL CODE § 2.05(1)(a); accordingly, charging and proof of violations represents a paradigmatic application of strict liability precepts.

and proof of the "culpable commission" of such an offense, *see id.* § 205(2)(b); in such instances, culpability must be established on the order of at least criminal negligence. *See id.* By their terms, these provisions operate either to reduce the grade of offenses or to implicate a culpability requirement of criminal negligence "unless a subsequent statute otherwise provides." *See id.* § 205(2).

Such restraints are described in the MPC commentary as reflecting a compromise between the legislative desire to enact absolute liability crimes and preservation of the elemental fairness ensured by the association of a *mens rea* element with serious offenses, *see* MODEL PENAL CODE § 2.05 comment (Official Draft 1962), with the MPC, like the common law, eschewing strict liability for offenses punishable by imprisonment. *See generally* MODEL PENAL CODE § 2.05 comment (characterizing Section 2.05 of the MPC as a "frontal attack" upon strict liability "whenever the offense carries the possibility of criminal conviction, for which a sentence of probation or imprisonment may be imposed").

The scheme established by Pennsylvania's comprehensive Crimes Code mirrors the MPC, with the substantial exception that the General Assembly replaced the concept of "violations" under the Model Penal Code with "summary offenses," *see* 18 Pa.C.S. §§ 302, 305, which carry a maximum term of imprisonment of ninety days. *See* 18 Pa.C.S. § 106(c). Thus, in Pennsylvania, while absolute liability generally may be imposed only on a limited basis (summary offenses and offenses defined by statutes other than the Crimes Code where "a legislative purpose to impose absolute liability ... plainly appears," 18 Pa.C.S. § 305(a)(1), (2)),[13] pursuant to the terms

---

**13.** The text of Section 305, entitled "Limitations on scope of culpability provisions," is as follows:

(a) **When culpability requirements are inapplicable to summary offenses and to offenses defined by other statutes.**—The requirements of culpability prescribed by[, *inter alia,*] ... section 302 of this title (relating to general requirements of culpability) do not apply to: (1) summary offenses, unless the requirement involved is included in the definition of the offense or the court determines that its application is consistent with effective enforcement of the law defining the offense; or

of the Crimes Code, such offenses may be punishable with imprisonment of up to 90 days as a general rule, and culpable commission may be established by proof of negligence to support the imposition of greater incarcerative sanctions. *See* 18 Pa.C.S. § 305(b).[14] The official commentary explains that

> (2) offenses defined by statutes other than this title, in so far as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears.
> **(b) Effect of absolute liability in reducing grade of offense to summary offense.**—Notwithstanding any other provision of existing law and unless a subsequent statute otherwise provides:
> (1) when absolute liability is imposed with respect to any material element of an offense defined by a statute other than this title and a conviction is based upon such liability, the offense constitutes a summary offense; and
> (2) although absolute liability is imposed by law with respect to one or more of the material elements of an offense defined by a statute other than this title, the culpable commission of the offense may be charged and proved, in which event negligence with respect to such elements constitutes sufficient culpability and the classification of the offense and the sentence that may be imposed therefor upon conviction are determined by section 106 of this title (relating to classes of offenses) and Chapter 11 of this title (relating to authorized disposition of offenders).
> 18 Pa.C.S. § 305. It should be noted that the culpability provisions of the Crimes Code are otherwise expressly applicable, as a general rule, to offenses defined by other statutes. *See* 18 Pa.C.S. § 107(a). Section 305, above, contains the pertinent exceptions.

**14.** The Crimes Code defines negligence for this purpose as follows:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.
> 18 Pa.C.S. § 302(b)(4). This definition embodies a heightened degree of negligence as compared to that which prevails in the civil setting, justified by the drafters of the Model Penal Code as follows:
> When people have knowledge that conviction and sentence, not to speak of punishment, may follow conduct that inadvertently creates improper risk, they are supplied with an additional motive to take care before acting, to use their faculties and draw on their experience in gauging the potentialities of contemplated conduct. To some extent, at least, this motive may promote awareness and thus be effective as a measure of control. Moreover, moral defect can properly be imputed to instances where the defendant acts out of

Section 305, like its corollary in the MPC, serves to " 'tone down' absolute or strict liability in penal law as a whole," since such responsibility "cannot be readily defended where the offense carries a possible jail sentence." 18 Pa.C.S. § 305, official cmt.[15] Also of significance, these provisions (like those of the MPC) are operative "unless a subsequent statute otherwise provides." 18 Pa.C.S. § 305(b).

If Section 305(b)(2) applies, therefore, homicide by vehicle/DUI is a summary offense, unless the culpable commission of the offense is charged and proved, in which case the elements would carry the minimum culpability requirement of criminal negligence. *See* 18 Pa.C.S. § 305(b)(2). The viability of such construction, however, depends upon the interpretation of the phrase "unless a subsequent statute provides," as it conditions the applicability of Section 305(b). *See* 18 Pa.C.S. § 305(b), *supra* note 13. *See generally Commonwealth v. Parmar*, 551 Pa. 318, 331, 710 A.2d 1083, 1089 (1998)(opinion in support of affirmance)(explaining that "[w]hen the General Assembly plainly indicates a legislative purpose to impose absolute liability, pursuant to Section 305(a)(2), the Commonwealth does not have to establish a *mens rea* element").[16] In

> insensitivity to the interests of other people, and not merely out of an intellectual failure to grasp them.
>
> MODEL PENAL CODE § 2.02 Comment at 243. *See generally Cordoba–Hincapie*, 825 F.Supp. at 501 (stating that "[a] properly calibrated negligence standard that makes allowance for the truly faultless person accomplishes the same result [as strict liability] without sweeping in those upon whom the law can have no effect").

15. This commentary appears to derive more directly from the MPC than the Crimes Code, since, as noted, the latter would allow for the imposition of a term of incarceration of up to ninety days upon conviction of an absolute liability crime. While the MPC formulation reflects an attempt to minimize interpretive and constitutional difficulties by limiting the application of strict liability to situations that will not result in imprisonment, by so raising the stakes in terms of the potential for imprisonment, the Pennsylvania scheme raises unique questions in such regard.

16. The application of Section 305(b)(2) also depends upon discernment of a legislative intent to impose absolute liability in connection with elements of the pertinent offense in the first instance. *See* 18 Pa.C.S. § 305(b)(2). Discussion of this question is deferred to a later portion of

*State v. Cho*, 297 Or. 195, 681 P.2d 1152 (1984), the Oregon Supreme Court determined that, in order for a subsequent statute to surpass Oregon's equivalent to Section 305(b)(2), the subsequent statute must, on its face, clearly indicate an intent to dispense with a culpable mental state requirement. *See id.* at 1152. Under the *Cho* interpretation, Section 305(b)(2) of the Crimes Code would apply to restrict the application of Section 3735 absent proof of culpability, since a legislative intent to dispense with a culpable mental state requirement is not clearly indicated upon an examination of the terms of the provision alone. However, in *State v. Miller*, 309 Or. 362, 788 P.2d 974 (1990), the Oregon court would appear to have disregarded its *Cho* construct in the process of determining that the state's DUI statute constituted a strict liability offense. Indeed, a dissenting jurist highlighted the court's divergence from *Cho* and advocated abandonment of *Cho's* reasoning. The dissent argued that the Oregon equivalent to Section 305(b)

> says to me that in statutes enacted outside the crimes code after January 1, 1972 [its effective date], wherein no culpable mental state is required ..., the offense is a violation, unless the legislature "otherwise provides." ... I would assert that the legislature, by establishing that violation of the DUII statute is a Class A misdemeanor, has otherwise provided; that is, the exception referent is to constituting a violation, not to the presence or absence of a culpable mental state requirement. Thus, under [the Oregon equivalent to Section 305(b)(2) ]—which is the applicable provision—DUII is a strict liability crime because (a) the statute requires no culpable mental state, and (b) the legislature has otherwise provided that DUII is a Class A misdemeanor. Under this approach, the legislature has done all it must do to make a post–1971 statute outside the criminal code a strict liability crime.

*Miller*, 788 P.2d at 982–83 (Carson, J., dissenting).

this opinion, since I would conclude that the strictures of Section 305(b)(2) are inapplicable for the reasons discussed immediately below.

I agree with this analysis.[17] Indeed, in order for Section 305(b)(2) to apply in the first instance, there must be a threshold determination that the General Assembly intended to impose strict liability with respect to at least some material element of the offense. *See* 18 Pa.C.S. § 305(b)(2); *see also supra* note 13. Once such intent is discerned from a subsequently enacted statute, it is rational to conclude that the General Assembly also intended the application of specified grading. Presumably, it is aware of the policies and precepts incorporated into the Crimes Code and could thus directly prescribe penalty provisions for post–1972 offenses corresponding with these policies if such were its intent. The most reasonable interpretation, then, is that the Legislature intended to allow itself a reasonable degree of flexibility in prescribing subsequent offenses, rather than burdening itself with a cumbersome series of required disclaimers to avoid the effect of prior statutes.

To summarize the above, contrary to the majority's conclusion, Section 302(a) of the Crimes Code does not support the attachment of a criminal negligence requirement associated with the offenses of homicide by vehicle or homicide by vehicle/DUI, nor do other provisions of the Crimes Code afford persuasive support.

### B.  This Court's Homicide By Vehicle Decisions

In addition to the Crimes Code's culpability provisions, the majority's rationale is predicated upon prior determinations of this Court in the homicide by vehicle setting, principally *Field*, 490 Pa. at 519, 417 A.2d at 160, and *Heck*, 517 Pa. at 192, 535 A.2d at 575. First, in *Field*, in addressing the argument that Section 3732 of the Vehicle Code violated constitutional precepts, the Court reasoned that the statute in fact included a culpability requirement deriving from the underlying summary Vehicle Code violation (there, driving on sidewalk, 75

17.  I would qualify such agreement, however, with the proviso that it must be plainly apparent in the first instance, from the application of precepts of statutory construction, that the legislature intended for strict liability to apply. Otherwise, the default culpability provisions of the Crimes Code would control.

Pa.C.S. § 3703), thus avoiding any constitutional impediment. *See id.* at 524–25, 417 A.2d at 163.[18] *Field* was vague in terms of identifying the precise nature of the culpability requirement discerned. *See Heck,* 517 Pa. at 197, 535 A.2d at 578 (noting that, in *Field,* "the question of what culpability was required was left unresolved").

*Field,* however, simply is unsupportable. Section 3703 of the Vehicle Code (like all other summary offenses under provisions of the Vehicle Code which lack a specific penalty term) constitutes a summary offense punishable solely by the imposition of a $25 fine. *See* 75 Pa.C.S. § 6502. Pursuant to the MPC and Section 305(a) of the Crimes Code, the culpability provisions are therefore wholly inapplicable to such infraction. *See* 18 Pa.C.S. § 305(a). Together with the strict limitation on the penalty, the absence of any express or default culpability requirement places such offense squarely among the purest forms of violations intended to be treated as absolute liability offenses and which are, almost beyond question, within the justifiable and permissible scope of absolute liability. *See supra* note 12 and accompanying text. *See generally Parmar,* 551 Pa. at 331, 710 A.2d at 1089 (opinion in support of affirmance)(stating that "[a] criminal statute that imposes absolute liability typically involves regulation of traffic or liquor laws"). Since the violation at issue clearly lacked *any* culpability requirement, *Field's* attempt to derive a culpa-

---

**18.** The entire culpability analysis provided in *Field* proceeded as follows:

> As the Attorney General recognizes, section 3732 requires the Commonwealth to prove that appellee has deviated from the standard of care established by section 3703, the underlying Vehicle Code provision allegedly violated here. Section 3703 provides:
> "No person shall drive any vehicle except a human-powered vehicle upon a sidewalk or sidewalk area except upon a permanent or duly authorized temporary driveway."
> Consistent with the culpability requirement, section 3703 leaves for a determination at trial whether appellee knew, or should have known, he engaged in the conduct claimed to be in violation of that section. Thus, for example, it remains to be decided if a reasonable driver could, in view of the congestion at the terminal exit, know where the sidewalk was or, indeed, if a sidewalk existed.

*Field,* 490 Pa. at 524–25, 417 A.2d at 163 (footnotes omitted).

bility requirement for homicide by vehicle from the underlying driving on sidewalk infraction lacks justification.

*Field* caused confusion in Pennsylvania courts on account of its flawed reasoning and by virtue of its failure to designate the degree of culpability necessary to support a conviction for homicide by vehicle. *See Heck,* 517 Pa. at 198–99, 535 A.2d at 578. Ultimately, this culminated in a divided, *en banc* decision of the Superior Court, *Commonwealth v. Koch,* 297 Pa.Super. 350, 443 A.2d 1157 (1982)(plurality). In the lead opinion, after expressing his disagreement with *Field's* reasoning, *see id.* at 355, 443 A.2d at 1160 (stating that, "[i]n effect, our supreme court has saved section 3732 from the due process challenge of criminal liability without fault by a bootstrap analysis"), Judge Wickersham concluded that this Court had effectively inserted a culpability requirement akin to civil negligence into Section 3732. *See id.* at 354–57, 443 A.2d at 1159–61. Judge Spaeth filed a concurring opinion also identifying errors in *Field's* reasoning, *see Koch,* 297 Pa.Super. at 362–66, 443 A.2d at 1162–65 (Spaeth, J., concurring), and arguing that the decision represented "neither a persuasive precedent, nor one that forecloses further attack on the constitutional validity of the statute creating the crime of homicide by vehicle." *Id.* at 359, 443 A.2d at 1162 (Spaeth, J., concurring).

This Court attempted to answer such criticisms and provide clarification in *Heck,* 517 Pa. at 192, 535 A.2d at 575, the second of the decisions relied upon by the majority in the present case. Although acknowledging the confusion, the Court admitted to no flaw in *Field,* but rather, maintained that *Field* "definitively answered the issue of whether § 3732 requires culpable conduct to sustain a conviction." *See id.* at 197, 535 A.2d at 578. The Court then stated that the confusion occurred as a result of the Superior Court's reliance upon dicta from *Field* and another decision, *Commonwealth v. Houtz,* 496 Pa. 345, 437 A.2d 385 (1981). *See id.*[19] Specifical-

19. *Houtz* expounded upon the *Field* reasoning as follows:

Th[e] legislative "expansion" [of criminal liability for homicide by vehicle] was accomplished not by the elimination of any of the elements of the crime of involuntary manslaughter, but by a relax-

ly, in responding to the criticism concerning the erroneous derivation of a culpability requirement from the offense underlying the homicide by vehicle charge, the Court stated, "[t]his criticism was unwarranted because the discussions of culpability in *Field* ... were not relevant to the issues which had been presented." *Id.* at 199, 535 A.2d at 579. Further, the Court indicated that its past decisions upholding the constitutionality of Section 3732 had effectively resolved the culpability question. *See id.* at 200, 535 A.2d at 579 (stating that, "without ever having been presented with the issue of the level of culpability required under § 3732, the tenor of our prior opinions rejecting constitutional challenges to the statute would appear to have resolved the issue" (citing *Commonwealth v. Hicks*, 502 Pa. 344, 466 A.2d 613 (1983))). The Court nonetheless indicated that it would not permit such a critical question to be answered by implication and offered the following conclusion:

> We now hold that ordinary negligence will not sustain a conviction for the offense of homicide by vehicle. The applicable mens rea requirements of culpability are those enumerated in 18 Pa.C.S. § 302(a).

* * *

The Official Comment to § 302 states that " 'Negligently' as used in Subsection (b)(4) is intended to mean *criminal negligence.*" The Legislature clearly did not intend the phrase "negligently" to encompass the tort liability concept of negligence. To the extent that decisions in this Commonwealth may be construed otherwise, they are expressly overruled.

ation of the degree of proof of two existing elements: culpable conduct and causation. The crime of involuntary manslaughter, as charged here, requires proof that the actor engaged in the Vehicle Code violation in a "reckless or grossly negligent manner," and that the death was caused "as a direct result." 18 Pa.C.S. § 2504. By contrast, under the crime of homicide by vehicle, it must be shown only that the actor "knew, or should have known," that he engaged in the conduct claimed to be in violation of the Vehicle Code, and that, at the very least, death was a "probable consequence" of the conduct. *Houtz*, 496 Pa. at 348–49, 437 A.2d at 387.

*Heck,* 517 Pa. at 200–01, 535 A.2d at 580 (emphasis in original).

In my view, the reasoning of *Heck,* like that of *Field,* merits critical review. Upon such examination, I would conclude that *Heck's* reasoning suffers, in the first instance, for its initial reliance upon *Field* as definitively answering the culpability question presented by Section 3732, since, as noted, *Field's* reasoning is unsound.[20] *Heck's* reference to Section 302(a) of the Crimes Code is conclusory; further, as discussed above, *see supra* § IIA, Section 302 of the Crimes Code does not employ criminal negligence as a default culpability requirement, nor do its provisions apply at all to subsequently enacted offenses as to which the General Assembly intended to impose absolute liability (rather, in such instances, Section 305 contains the relevant provisions). Accordingly, *Field* and *Heck* lack a critical element of the required analysis, namely, the application of principles of statutory construction to determine whether the General Assembly intended to apply strict liability in a subsequently enacted offense contained in a provision of Pennsylvania law outside the Crimes Code. *Cf. Commonwealth v. Cheatham,* 419 Pa.Super. 603, 610, 615 A.2d 802, 806 (1992)(Cirillo, J.)(observing that, in *Heck,* "[t]he Pennsylvania Supreme Court rehabilitated the [homicide by vehicle] statute by adding a *mens rea* requirement to what is, on its face, a strict liability statute"). *See generally Parmar,* 551 Pa. at 331, 710 A.2d at 1089 (opinion in support of affirmance)(setting forth the pertinent analytical principles vis-à-vis the determination of legislative intent in relation to absolute liability).

In summary of the above, contrary to the majority's present analysis, neither *Field* nor *Heck* provides persuasive support for the proposition that the General Assembly intended for a

**20.** *Heck's* own assessment of *Field* appears to be internally inconsistent, as the Court, on the one hand, stated that *Field* "definitively answered the issue of whether § 3732 requires culpable conduct," *see Heck,* 517 Pa. at 197, 535 A.2d at 578, and, on the other, stated that "the discussions of culpability in *Field* ... were not relevant to the issues which had been presented," and were thus dicta. *See id.* at 199, 535 A.2d at 579.

requirement of criminal negligence in the homicide by vehicle or homicide by vehicle/DUI contexts.

### III. Did the General Assembly Intend to Include Strict Liability Elements in the Homicide By Vehicle and Homicide By Vehicle/DUI Statutes?

As noted, since the present question involves Vehicle Code provisions enacted after promulgation of the Crimes Code, and such provisions lack express culpability requirements attaching to their elements, it is necessary to examine the intent of the General Assembly to determine whether strict liability was intended.

### A. Homicide by Vehicle

Prior to this Court's decision in *Field,* a divided *en banc* panel of the Superior Court undertook just such an examination in a comprehensive fashion in the context of Section 3732. *See Commonwealth v. Barone,* 276 Pa.Super. 282, 419 A.2d 457 (1980)(plurality).[21] The lead opinion, authored by then-President Judge Cercone, endorsed the proposition, advocated by the majority herein, that the General Assembly did not intend to impose absolute liability for homicide by vehicle, but rather, incorporated a culpability requirement of criminal negligence. *See Barone,* 276 Pa.Super. at 297, 419 A.2d at 465 (Cercone, P.J.). President Judge Cercone opened his discussion by noting the strong common law tradition against strict penal responsibility, and the embodiment of such tradition within the Model Penal Code, and, correspondingly, the culpability provisions of the Pennsylvania Crimes Code. *See id.* at 290–91, 419 A.2d at 462. Regarding the directive of Section 305(a)(2) to the effect that the Crimes Code's culpability requirements do not apply to offenses defined by other statutes "insofar as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof *plainly appears,*" 18 Pa.C.S. § 305(a)(2)(em-

---

**21.** Centrally, *Barone* concerned the constitutionality of the homicide by vehicle statute, measured, *inter alia,* against the contention that the statute offended due process precepts by encompassing non-culpable conduct.

phasis added); *see supra* note 13, President Judge Cercone found no such intent apparent in Section 3732's proscription. In the first instance, he deemed significant the use of the word "homicide" in the title to the enactment, given the traditional association between the concept of criminal homicide and fault. *See Barone*, 276 Pa.Super. at 291–93, 419 A.2d at 462–63.[22] While acknowledging the placement of the word "unintentionally" within the statute, *see* 75 Pa.C.S. § 3732, *supra* note 8, a focus of the dissenting opinion, *see infra*, President Judge Cercone concluded that, taken in context, the word denoted solely that the conduct causing the death was not undertaken with purpose or design. *See Barone*, 276 Pa.Super. at 292, 419 A.2d at 463 (Cercone, P.J.). Addressing the positions taken by concurring and dissenting judges to the effect that strict liability was intended by the Legislature, President Judge Cercone reasoned that such position lacked grounding in reasoned social policy, and, therefore, its effectuation was not likely within the scope of the intended purpose underlying the statute.[23]

**22.** In his concurring opinion, Judge Spaeth expanded upon this point as follows:

Criminal homicides have always required some degree of culpability. Under the Crimes Code, criminal homicide is defined as "intentionally, knowingly, recklessly or negligently caus[ing] the death of another human being," and includes "murder, voluntary ... [and] involuntary manslaughter." 18 Pa.C.S. § 2501(a) and (b). Thus, the legislature's use of the word "homicide," in defining the crime of "homicide by vehicle," supports the conclusion that the legislature intended to require proof of some degree of culpability, for where the legislature "borrows terms of art ... it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."

*Barone*, 276 Pa.Super. at 314–15, 419 A.2d at 474–75 (Spaeth, J., concurring).

**23.** President Judge Cercone explained that:

if the ultimate goal is to protect the public from imprudent driver conduct, then what purpose is to be served by punishing an operator who may have acted reasonably and prudently under the circumstances[?] To demonstrate, failing to adhere to the left-right-left rule when merging into traffic involves more risk to others; however, in a civil action a jury of the defendant's peers may find that it was not unreasonable to omit to observe this rule when the defendant is rushing an injured person to a hospital. To hold, as the [d]issent

Further, in light of the General Assembly's failure to specify a culpability element for the offense, President Judge Cercone invoked specific principles of statutory construction, examining the circumstances surrounding the enactment, the harm sought to be regulated and prevented, the object sought to be obtained, the consequences of particular constructions, and the germane legislative history. *See id.* at 293, 419 A.2d at 463. Pertaining to the circumstances surrounding the enactment, President Judge Cercone recognized its derivation from the Uniform Vehicle Code in connection with an effort to reform Pennsylvania's comprehensive scheme of traffic regulation. *See id.* at 294–95, 419 A.2d at 464 (reasoning that, "[i]n retrospect, ... the subject legislation was not an isolated amendment to the Motor Vehicle Code motivated solely by the carnage on our roadways and the 'inadequacy' of our involuntary manslaughter statute[;] [r]ather, the vehicular homicide proviso was but one aspect of a massive overhauling of all Pennsylvania rules of the road"). Addressing the concurring and dissenting positions that the General Assembly chose to enact a distinct offense governing vehicular homicides to reduce fatalities on Pennsylvania roadways, President Judge Cercone reasoned that:

> these weighty concerns are not jeopardized by reading the subject statute as not dispensing with the requirement that the harm causing violation must nevertheless be culpable. More directly, to credit the legislature with an intent to deter life endangering conduct on our roadways is to acknowledge that in order for punishment to be efficacious and just under this provision, it must be predicated upon the accused's awareness of the factors which made his conduct criminal. Thus, conviction, punishment, and sentence may well provide inadvertent violators with an additional incentive to take more care in both evaluating the

does, that this same defendant may be criminally punished without reference to his state of mind simply does not make sense. If, with reference to the accused's evaluation of and perception of the operative factors, his conduct conforms to what is socially acceptable under the same or similar circumstances, how does this mark him as one who needs to suffer punishment?
*Barone*, 276 Pa.Super. at 293, 419 A.2d at 463.

risks they consciously create and those which they unreasonably fail to perceive. In either case, however, the assumption which underlies the punishment is that the actor ignored the operative factors in creating a risk of harm to others. Confronted with imprisonment, the violator may indeed think twice prior to speeding through a densely populated neighborhood. On the other hand, to suggest as the [d]issent does that our legislature intentionally chose to disregard the social utility of the driver's conduct is to impute to the legislature a harshness and shortsightedness which we cannot. While there is always some risk associated with driving an auto, we do not think that the legislature in its collective wisdom intended to abrogate the possibility of a finding that the risk taken was reasonable under the particular circumstances.

*Barone,* 276 Pa.Super. at 295–96, 419 A.2d at 464–65 (Cercone, P.J.).[24] President Judge Cercone ultimately acknowledged that the General Assembly's purpose in effectuating the statute likely related to perceived inadequacies in the involuntary manslaughter statute relative to vehicular homicides. He concluded, however, that the General Assembly intended to fill such void by criminalizing only such violations as entailed a "gross deviation" from the required standard of care, or, in other words, criminal negligence as defined by the culpability provisions of the Crimes Code, 18 Pa.C.S. § 302(b)(4). *See Barone,* 276 Pa.Super. at 297, 419 A.2d at 465–66.[25]

**24.** Related to the efficacy of the involuntary manslaughter statute, President Judge Cercone also observed that

[t]his [c]ourt has recently ruled that the convenience of investigation and prosecution is not the polestar in ascertaining what the essential elements of an offense are or what degree of culpability must accompany them. We concede that the history of this proviso confirms a legislative judgment that a distinct offense was needed due to the reluctance of juries to convict for involuntary manslaughter in fatal traffic accident cases; however, we dispute that this history supports the further proposition that as a result of this difficulty the legislature threw in the proverbial towel and deemed it essential to punish every violator no matter how reasonable his conduct.

*Barone,* 276 Pa.Super. at 296–97, 419 A.2d at 465 (Cercone, P.J.).

**25.** President Judge Cercone acknowledged the difficulties presented to juries charged with discriminating between recklessness and criminal

Contrary to the view expressed in the lead opinion, Judge Spaeth, in concurrence, concluded that the General Assembly's intent was to impose absolute liability pursuant to Section 3732 of the Vehicle Code. *See Barone,* 276 Pa.Super. at 301, 419 A.2d at 467–68 (Spaeth, J., concurring).[26] From federal and state cases, Judge Spaeth discerned a practice, in resolving the intertwined questions of whether the imposition of strict criminal liability was intended by the legislature and the consistency of such imposition with constitutional due process, of examining: the policy and intent of the legislature; the origins of the offense; the reasonableness of the standards imposed; and the punishment and stigma attached to a conviction. *See id.* at 306–07, 419 A.2d at 470.[27] In implementing such test, Judge Spaeth first noted that the mere omission of any mention of intent should not be construed as dispensing with it, *see id.* at 311, 419 A.2d at 473, and proceeded to focus upon the general policy of the Legislature toward strict liability crimes; the common law origins and history of the specific crime at issue; and the relevant legislative history. *See id.*

In evaluating these considerations, Judge Spaeth discerned an even balance between factors for and against the conclusion that the legislature intended to apply strict criminal liability in the implementation of the Section 3732 offense. *See id.* In

negligence; however, he expressed confidence in the common pleas courts' ability to formulate appropriate instructions. *See Barone,* 276 Pa.Super. at 297 n. 26, 419 A.2d at 465 n. 26.

**26.** Judge Spaeth ultimately concluded, however, that such imposition violated due process under the Pennsylvania Constitution. *See Barone,* 276 Pa.Super. at 323–34, 419 A.2d at 479–85 (Spaeth, J., concurring). Such analysis is not directly implicated in the present case, since Appellant has not pursued a constitutional challenge.

**27.** In this regard, Judge Spaeth discussed the federal courts' treatment of offenses which lacked express culpability requirements. He examined instances of application of this test in terms of cases in which courts had determined that the legislative body intended to impose strict criminal liability and found it consistent with due process; those in which a requirement of intent was read into the statute; and those in which a requirement of intent could not be read into the statute, but the statute was deemed to violate due process. *See id.* at 308–09, 419 A.2d at 471–72. Judge Spaeth further noted that Pennsylvania courts had consistently applied the same analysis utilized in the federal courts. *See id.* at 309–10, 419 A.2d at 472.

addition to the general principle that penal statutes are to be strictly construed, he acknowledged several other factors militating against the conclusion that the legislature intended to impose strict criminal liability, including: the legislative policy against strict criminal liability;[28] the history of the term "homicide" as described in the lead opinion, *see supra* note 22 and accompanying text; as well as the discussions of legislators connected with the General Assembly's decision not to create the crime of careless driving, *see id.* at 316–18, 419 A.2d at 475–76.[29]

In favor of the strict liability construction, Judge Spaeth elaborated upon the derivation of the statute from the Uniform Vehicle Code in terms of the development of the uniform law provision, tracking its modification from 1956 through 1962 from one proscribing "reckless disregard," to "negligent homicide," to "violation of any state law or municipal ordinance." *See Barone*, 276 Pa.Super. at 319, 419 A.2d at 477 (Spaeth, J., concurring). According to Judge Spaeth, such changes made it "clear that the drafters of the Uniform Vehicle Code intended to change the character of the crime, and to make it into a strict liability crime, requiring proof of no more than a mere violation of any traffic ordinance that resulted in the death of another." *Id.* (citing Commentary, HOMICIDE BY VEHICLE 1 (1978)). Contrasting Pennsylvania's efforts with the experience of other states that have preserved express elements of culpability within their vehicular homicide statutes (or the equivalent), Judge Spaeth indicated:

**28.** In this regard, Judge Spaeth emphasized the MPC attack upon strict liability and the incorporated stringency of the Crimes Code in terms of its implementation. *See Barone*, 276 Pa.Super. at 314, 419 A.2d at 474 (Spaeth, J., concurring)("[t]he requirement in this section that the intention to create strict (or 'absolute') criminal liability must 'plainly appear' manifests a strong legislative policy against strict liability crimes").

**29.** In such respect, Judge Spaeth indicated that "[t]his history manifests a desire on the part of the legislature not to make citizens subject to criminal sanctions for mere carelessness." *Barone*, 276 Pa.Super. at 318, 419 A.2d at 476 (Spaeth, J., concurring). It should be noted that the Legislature subsequently added careless driving as a summary offense punishable by imposition of a $25 fine. *See* 75 Pa.C.S. §§ 3714, 6502.

We must assume, I believe, that when the Pennsylvania legislature enacted section 3732, it was aware of the history of that section in Ohio and the other states that added or retained some requirement that the defendant act negligently or recklessly. Yet, although it very easily could have done so, the legislature did not add any requirement of negligence or recklessness to the section, nor did it enact the 1956 version of section 11–903(a) of the Uniform Vehicle Code. Thereby the legislature indicated its intent to adopt the 1962 revision, requiring proof of no more than a traffic violation causing death.

*Barone,* 276 Pa.Super. at 319–20, 419 A.2d at 477 (Spaeth, J., concurring). Finally, Judge Spaeth observed that, if the General Assembly had intended to limit criminal violations under Section 3732 to reckless or negligent actors, it need not have enacted the section at all, since those defendants already were subject to prosecution for involuntary manslaughter. *See id.* at 320–21, 419 A.2d at 477–78 (citing 18 Pa.C.S. § 2504). In this regard, he indicated:

a consideration of the crime of involuntary manslaughter provides what seems to me a probably correct explanation of why the legislature intended to create strict criminal liability under section 3732. The cases demonstrate that the Commonwealth has had difficulty in obtaining convictions for involuntary manslaughter, for proof of a traffic violation may not be proof of recklessness or gross negligence. It seems probable that in enacting section 3732, the legislature intended to overcome this difficulty by broadening the scope of liability to include those persons who merely violated traffic ordinances. The North Carolina court in *State v. Freeman*[, 31 N.C.App. 93, 228 S.E.2d 516 (1976),] attributed just such an intent to the North Carolina legislature.

*Barone,* 276 Pa.Super. at 320–21, 419 A.2d at 478 (Spaeth, J., concurring)(footnotes and citations omitted).[30]

**30.** Judge Spaeth quoted the North Carolina Supreme Court as follows:
The number of deaths resulting from the operation of motor vehicles on the highways has increased to an alarming extent. Indictment for

Judge Spaeth concluded his substantive analysis by returning to the "plainly appears" language of Section 305(a)(2), *see supra* note 13 and accompanying text, concluding that, in view of the history of the statute and in contemplation of the General Assembly's probable purpose of broadening liability beyond that contained in the involuntary manslaughter provision of the Crimes Code, "for me, it appears plainly enough." *Barone*, 276 Pa.Super. at 322, 419 A.2d at 478 (Spaeth, J., concurring). He acknowledged that he regarded his decision in this regard as "exceedingly close." *Id.*[31]

Judge Wieand dissented, opening with the observation that the statutory language does not require culpability further than that associated with the underlying violation, *Barone*, 276 Pa.Super. at 335, 419 A.2d at 486 (Wieand, J., dissenting)("the legislature determined to make criminal responsibility dependent upon violation of a traffic law and not necessarily on

> the common law crime of manslaughter has proved ineffective as a means of repressing the negligence in motor vehicle operation causing death upon the public thoroughfares. The motorist is generally a reputable citizen, and the wrong committed by him which brings someone to his death is most often an unintentional violation of a prohibitory statute or ordinance, unaccompanied by recklessness or possible consequences of a dangerous nature, when tested by the rule of reasonable prevision. Thus it is apparent that the intention of the legislature in enacting [homicide by vehicle] was to define a crime of lesser degree of manslaughter wherein criminal responsibility for death by vehicle is not dependent upon the presence of culpable or criminal negligence.

*Barone*, 276 Pa.Super. at 321, 419 A.2d at 478 (Spaeth, J., concurring)(quoting *Freeman*, 228 S.E.2d at 519).

**31.** Judge Spaeth concluded his discussion with the following observations regarding the policy underlying the imposition of absolute liability in the Section 3732 context:

> It has been argued that as a matter of policy, it would be most unwise to impose strict criminal liability for conduct such as appellee's [namely, an unintentional failure to yield the right of way]. I entirely agree; but I may not permit my opinion on a matter of policy to affect my decision here, for so long as the legislature acts lawfully, it is entitled to decide matters of policy. Our duty as a court, is not to examine the wisdom of the legislature's decisions, as reflected in its enactment, but to determine and then enforce the meaning of that enactment.

*Barone*, 276 Pa.Super. at 322–23, 419 A.2d at 478–79 (Spaeth, J., concurring) (citations omitted).

culpable or criminal negligence"), and emphasizing the legislative authority to define a crime so that proof of criminal intent is not necessary, particularly in an area of unique legislative concern, such as highway safety. *See id.* at 335–36, 419 A.2d at 485–86. Judge Wieand observed that comparable statutes adopted in other jurisdictions similarly have been construed to eliminate a requirement of culpable conduct; further, he cited Superior Court precedent to the effect that the Legislature intended to reduce the degree of culpability necessary to support a conviction of homicide by vehicle. *See id.* at 337, 419 A.2d at 486 (citing *Commonwealth v. Trainor,* 252 Pa.Super. 332, 337 n. 4, 381 A.2d 944, 947 n. 4 (1977)). Referencing the derivation of the statute from the Uniform Vehicle Code, Judge Wieand indicated that "[u]nder this section, the gravamen of the offense was intended to be the violation of a traffic law which resulted in death." *Id.* at 338, 419 A.2d at 487. Judge Wieand agreed with Judge Spaeth's view that "the history of the provision in other states merely confirms that the legislature in Pennsylvania deliberately chose to premise criminal responsibility solely upon a traffic violation," *id.;* however, contrary to his colleague's view, Judge Wieand concluded that the statute comported with constitutional precepts. *See id.* at 338–40, 419 A.2d at 487–88.

It seems, at least to me, that each of the positions expressed in *Barone* represents a defensible view displaying due and reasoned consideration of the pertinent legislative intent.[32] Ultimately, I would endorse the essential position of Judges Spaeth and Wieand to the effect that the General Assembly in fact intended to create a strict liability offense, placing particular emphasis upon the derivation of the statute from the Uniform Vehicle Code as it had evolved from one grounded in reckless conduct to one containing no culpability requirement; the juxtaposition of the offense to the existing crime of

**32.** I believe that efforts of jurists of the intermediate appellate courts on the order of those offered by President Judge Cercone, Judge Spaeth, and Judge Wieand in *Barone* are worthy of acknowledgment and should be encouraged, as they benefit Pennsylvania jurisprudence generally, and the jurisprudence of this Court in particular by informing our own decisions.

involuntary manslaughter; the experience of other states which have added an express culpability requirement, *see Barone,* 276 Pa.Super. at 319–20, 419 A.2d at 477 (Spaeth, J., concurring); and the decisions of other jurisdictions finding that similarly worded provisions embody an attempt to impose absolute liability based upon the strong legislative purpose of encouraging safe driving. *See, e.g., Freeman,* 228 S.E.2d at 519.[33] While certainly such statutes providing for serious penalties represent a marked departure from the MPC paradigm, it is quite clear that since the introduction of the MPC into state crimes legislation, the penal law and its underlying policies have changed with the proliferation of offenses, more severe grading, and sentencing enhancements. *See generally* Markus Dirk Dubber, *Penal Panopticon: The Idea of a Modern Model Penal Code,* 4 BUFF.CRIM. L.REV. 53, 53–54 (2000)(arguing that "[s]ince its publication in 1962, the conceptual foundation of the Model Code has collapsed in form and in substance"). Notably, by replacing the MPC conception of violations (to which no term of imprisonment may attach) with summary offenses (permitting imprisonment of up to 90 days), *see* 18 Pa.C.S. § 106(c), even upon enactment of the Crimes Code in 1972, the Pennsylvania General Assembly conveyed a substantially broader view of strict or absolute liability than the drafters of the MPC envisioned. *See supra* § IIA.[34]

**33.** As reflected in various of the positions in *Barone,* I would read the word "unintentionally" in former Section 3732 as related to the killing, distinguishing this form of homicide from intentional crimes such as voluntary manslaughter or murder.

**34.** I recognize Judge Spaeth's position that the analysis should include an assessment of the constitutionality of the imposition of strict liability in determining legislative intent. *See generally* 1 Pa.C.S. § 1922(3). However, given the fairly widespread imposition of strict liability in the enhanced gradation of offenses resulting in highway deaths, and the lack of clarity at the federal and state levels concerning the conformance of such with constitutional precepts given the severity of the penalties imposed, *see generally Cordoba–Hincapie,* 825 F.Supp. at 515, it appears that, by omitting a culpability term, the General Assembly sought to impose the least stringent culpability requirement permissible. It would be far preferable, of course, for the Legislature to expressly indicate its intentions as to culpability—this would assure greater precision in the law and establish a clear baseline from which constitutional considerations could be addressed, fostering greater ac-

■■■■■■■■

*Staples,* 511 U.S. at 616, 114 S.Ct. at 1802 ("[h]istorically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*").

Finally, as Justice Newman emphasizes, last year the General Assembly inserted a specific culpability requirement into the homicide by vehicle statute. It could be argued that such constitutes a manifestation of its prior intent. This change, however, occurred in connection with an enhancement in the grading of the offense from a first-degree misdemeanor to a third-degree felony. It could also be argued, therefore, that the Legislature believed that the culpability requirement was necessary to the imposition of a greater penalty. The legislative history, however, would suggest that neither of the above may be the case. For example, prior to the Senate vote on the legislation, the Honorable Robert J. Mellow, a co-sponsor, advocated its passage with emphasis upon the enhanced penalties provided and the salutary effect of such enhancement in terms of encouraging safe driving.[35] The pertinent bill analy-

countability of both the legislative and judicial branches in terms of their mandates and pronouncements.

In this situation, I believe that the statutory analysis need not proceed interdependently with the constitutional assessment, as Judge Spaeth's own analysis ultimately reflects. Accordingly, I would reserve the question of what is the least stringent culpability requirement permissible for a case in which the constitutional questions are presented in a direct and meaningful fashion. *See, e.g.,* Alan C. Michaels, *Constitutional Innocence,* 112 HARV. L.REV. 828 (Feb. 1999)(describing one proposed theory for a constitutional doctrine of *mens rea*). Such questions would, of course, be reopened if this Court were to determine that absolute liability was in fact intended by the Legislature in the first instance. For example, *Field* and *Heck* do not answer the constitutional question on these terms, as both read criminal negligence into the statute and indicate that its inclusion suffices to satisfy constitutional concerns; neither recognizes an intent to impose the least stringent culpability requirement permissible, or provides analysis of constitutional precepts to describe such requirement. *Cf. Cordoba–Hincapie,* 825 F.Supp. at 508 (noting that courts generally fail to divide clearly statutory interpretation from constitutional law in the jurisprudence of *mens rea*).

**35.** After describing the circumstances of a fatal accident resulting from a Vehicle Code violation, Senator Mellow explained:

Now, Mr. President, I think we have to extend to violators of the Motor Vehicle Code the same thing that we have extended to viola-

sis suggests that the insertion of a culpability requirement was predicated upon an interpretation of what the courts had determined was required rather than a reflection of the General Assembly's own prior intentions.[36]

## B.  *Stare Decisis*

I have suggested above that this Court's decisions in *Field* and *Heck* contain inadequate reasoning and fail to address the central consideration of whether the General Assembly intended to impose strict liability in Section 3732 via principles of statutory construction and conventional absolute liability analysis.  I acknowledge, however, that such decisions constitute precedent, and that there are sound reasons to adhere to such authorities even if not perfectly reasoned.  *See generally Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991)(emphasizing the role of precedent in furthering "the evenhanded, predictable, and consistent development of legal principles, ... reliance on judicial decisions,

tors of the Motor Vehicle Code who have been under the influence of alcohol and/or drugs....

I do not think that these particular incidents should be lightly treated.  Prior to this, we treated it as a misdemeanor.  With the enactment of this bill, it will be changed to a third-degree felony, which will give the presiding judge much more discretion in sentencing.

So, Mr. President, I am thankful that we are able to bring it to the floor of the Senate.  It is a very important piece of legislation.  I am very sorry for the family [involved], but at least we can tell people in Pennsylvania that if you are going to speed and drive out of control and there is a fatality involved, that you are going to pay a very healthy price in Pennsylvania.

Legislative Journal, Senate 1962 (October 11, 2000).

**36.**  For example, the Republican analysis of the bill leads with the statement that "[t]his section setting forth offense of homicide by vehicle can pass constitutional muster only if it is interpreted to require for conviction a degree of misconduct rising to the level of criminal negligence."  Republican Bill Analysis for Senate Bill 1312 (1999 Regular Session, posted Nov. 20, 2000)(citing various decisions of Pennsylvania appellate courts).  The Democratic analysis indicates that "SB 1312 changes the standard for vehicular homicide currently in § 3732 of Title 75 from 'unintentionally' causing the death of another person to 'recklessly or with gross negligence' to conform to state Supreme Court decisions regarding what constitutes culpability to sustain a conviction of homicide."  Democratic Bill Analysis for Senate Bill 1312 (1999 Regular Session, posted Nov. 20, 2000).

and ... the actual and perceived integrity of the judicial process"). There are also instances, however, which call for reconsideration of prior decisions. For example, as this Court has stated:

> [t]he doctrine of *stare decisis* was never intended to be used as a principle to perpetuate erroneous principles of law. While we fully ascribe to Lord Coke's evaluation of the importance of certainty in the law, this end obviously cannot outweigh the necessity of maintaining the purity of the law. The court's function is to interpret legislative enactments and not to promulgate them. Where, as here, by our decisions ... the Court distorted the clear intention of the legislative enactment and by that erroneous interpretation permitted the policy of that legislation to be effectively frustrated, we now have no alternative but to rectify our earlier pronouncements and may not blindly adhere to the past rulings out of a deference to antiquity.

*Mayhugh v. Coon,* 460 Pa. 128, 135, 331 A.2d 452, 456 (1975); *see also Ayala v. Philadelphia Bd. of Pub. Ed.,* 453 Pa. 584, 606, 305 A.2d 877, 888 (1973)("the doctrine of *stare decisis* is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish"). *See generally Cordoba–Hincapie,* 825 F.Supp. at 501 (warning of the "dangers in patchwork criminal codes and decisions that lack internal consistency and leave basic questions unanswered").

Given the above, the expressions by jurists engendered by *Field* and *Heck,*[37] the Court's continuing reliance upon these

---

**37.** *See, e.g., Heck,* 517 Pa. at 201, 535 A.2d at 580 (McDermott, J., dissenting)(characterizing the majority holding as "without analysis or citation" and a usurpation of the General Assembly's power to define crimes); *Koch,* 297 Pa.Super. at 360, 367, 443 A.2d at 1162, 1166 (Spaeth, J., concurring)(advocating reconsideration of reasoning such as *Field's,* so that such "propositions will become more accurate, and command not only obedience but respect," and positing, with reference to *Field,* that "if a rational jurisprudence has become a lost cause, we're in trouble deep indeed"); *Koch,* 297 Pa.Super. at 368, 443 A.2d at 1166 (Cercone, P.J., concurring and dissenting)(stating that "the Supreme

decisions to assess culpability requirements of other statutes, the desirability of an analysis employing principles of statutory construction and related precepts developed in the strict liability context, and the constitutional implications of the presence or absence of *mens rea* requirements, I believe that this Court would be well served in providing a fuller assessment of culpability in the homicide by vehicle and homicide by vehicle/DUI context.

In summary, I would hold that the offense of homicide by vehicle was intended by the General Assembly to embody absolute liability, although, in light of this conclusion, I would reserve decision concerning the constitutionality of the statute for an appropriate case.

### C. Homicide by Vehicle/DUI

Since I have concluded that homicide by vehicle was intended by the General Assembly to operate as a strict liability offense, it follows that homicide by vehicle/DUI should be construed likewise. Recently, in his dissenting opinion in *Commonwealth v. Collins*, 564 Pa. 144, 764 A.2d 1056 (2001), Mr. Justice Nigro summarized the derivation of Section 3735 from Section 3732 and described the relationship between the provisions as follows:

> Although, mechanically, the General Assembly reposited the homicide by vehicle/DUI provisions in a separate section of the Vehicle Code, the essential import of this act was to increase the grading of homicide by vehicle/DUI ... and provide a mandatory minimum sentence of three years imprisonment. Further, the act amended Section 3732 (homicide by vehicle) by adding the words "except Section 3731(DUI)." Thus, the Legislature clearly indicated that while the commission of any traffic violation that resulted in the loss of human life was a serious offense, driving under the influence implicated a greater social evil and therefore warranted a concomitantly greater and more certain penalty.

Court pulled the homicide by vehicle statute out of the mire of unconstitutionality by its proverbial bootstraps").

*Collins,* 564 Pa. at 153, 764 A.2d at 1061.[38] The statutes operated identically, with the only material difference being the nature of the predicate offense, and, in the case of Section 3735, the predicate offense itself would generally implicate a greater degree of blameworthiness.[39] Accordingly, I agree with the majority's conclusion that the culpability assessment should be the same; my difference is merely in the nature of the assessment in the first instance.[40]

**38.** The majority in *Collins* did not take issue with this analysis, but rather, concluded that there was no merger of homicide by vehicle and homicide by vehicle/DUI, since the predicate traffic violation underlying the homicide by vehicle conviction must be other than DUI. *See Collins,* 564 Pa. at 150, 764 A.2d at 1059 (emphasizing that "the legislature crafted the statutory elements of the two offenses as mutually exclusive").

**39.** Some courts have justified the severe penalties associated with DUI and related offenses by treating the statutes as creating a presumption of culpability rather than as imposing absolute liability. *See, e.g., People v. Lardie,* 452 Mich. 231, 551 N.W.2d 656, 665 (1996)(concluding that, "[i]n eliminating the issue of gross negligence as a question of fact for the jury, the [l]egislature essentially has presumed that driving while intoxicated is gross negligence as a matter of law"). Such interpretation may facilitate the availability of defenses reflecting an absence of moral blameworthiness, such as involuntary intoxication and exigent circumstances; *see id.* at 665 ("[t]he presumption of gross negligence from the act itself is only reasonable if the defendant (1) *voluntarily* decided to drive and (2) drove *knowing* that he had consumed an intoxicating liquor or controlled substance"). However, such interpretation must be weighed in light of the General Assembly's probable desire to ease the Commonwealth's burden of proof and, perhaps correspondingly, avoid the assertion of pretextual defenses (such policy has been discerned and emphasized by the New Jersey Supreme Court, *see, e.g., Fogarty,* 607 A.2d at 627). Moreover, the constitutional concerns are not avoided by the employment of presumptions concerning offense elements, since in the criminal law they implicate constitutional questions akin to those presented in the strict liability context. *See generally Francis v. Franklin,* 471 U.S. 307, 326, 105 S.Ct. 1965, 1977 (1985); *Cordoba–Hincapie,* 825 F.Supp. at 508 (characterizing a presumption of culpability as, "in effect, a *prima facie* strict liability standard").

**40.** It should be noted that various commentators advocate an "elements" analysis as opposed to an "offense" analysis in determining legislative intent and constitutional compliance in the strict liability arena, *see generally* Robinson & Grall, *Element Analysis,* 35 Stan. L.Rev. at 715–18 (distinguishing between a form of analysis attempting to assign a single culpability element to an overall offense, and one which assigns a culpability element to each element of an offense), and the MPC follows this approach. *See generally* Robinson & Grall, *Element*

## IV. Conclusion

According to one commentator, the complexities involved in statutory construction and constitutional analysis in the strict criminal liability arena reflect "the complexity of our moral blaming judgements and of the legal structure in which those judgements are embedded." Simmons, *When Is Strict Criminal Liability Just?*, 87 J.CRIM. L. & CRIMINOLOGY at 1137. The Pennsylvania General Assembly has clearly moved beyond the comparatively comfortable framework of the MPC in terms of the imposition of absolute liability in the criminal law context. Correspondingly, and as gradations are enhanced and penalties are increased, the constitutional stakes are raised. *See Cordoba–Hincapie*, 825 F.Supp. at 515 (recognizing that "[t]he cases, despite their uneven nature, impart a clear message that there is a continuing constitutional importance to the *mens rea* principle[;] [t]he outer limits of what is permissible have not been drawn, but such limits certainly exist").[41] The

*Analysis,* 35 Stan. L.Rev. at 683 (stating that "[t]he general culpability provisions of the Model Penal Code ... recognize that a single offense definition may require a different culpable state of mind for each objective element of the offense"); *id.* (stating that jurisdictions that have adopted the Model Penal Code must "apply an element analysis to each offense and theory of liability"). The pertinent analysis would entail revisiting the question of whether DUI itself is a strict liability offense, the subject of the Court's divided opinion in *Mikulan,* 504 Pa. at 244, 470 A.2d at 1339. Suffice it to say, from my present concurring posture, that a substantial number of jurisdictions have adopted the position that DUI is a strict liability offense, particularly where the legislature has included a *per se* method of proof, *see, e.g.,* 75 Pa.C.S. § 3731(a)(4). *See supra* note 2. I would also disagree with the lead opinion of *Mikulan* that Section 302(b)(5) of the Crimes Code should, by its terms, operate as a restriction on the application of Section 3731, for the reasons stated in Section IIA herein. Additionally, a recent informal survey of the common pleas courts indicates that DUI represents between 20 and 40 percent of the caseload (as a percentage of total cases) in most counties. The substantial weight of such caseload further supports the conclusion that the Legislature intended to minimize the burden upon the government pertaining to trials in this context.

41. *Cordoba–Hincapie's* final conclusions concerning culpability in the context of federal drug offenses does not appear to be widely accepted in the federal circuit courts. However, no court could dispute Judge Weinstein's fundamental grasp of the issues involved, or the integrity and breadth of his effort to deal squarely with the constitutional issues presented in the strict liability context.

majority, and *Field* and *Heck* before it, successfully surmounted the complexities here involved by divining a culpability requirement where none was indicated, doing so without reference to the conventional tools of statutory construction or strict liability analysis. The salutary effect is an approximation of the common law and MPC restraints upon strict liability by inserting the middle-ground concept of negligence into the pertinent offenses. *See generally* Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct. Rev. at 110 (1962)(arguing that "the idea of criminal responsibility based upon the actor's failure to act as carefully as he should affords an important and largely unutilized means for avoiding the tyranny of strict liability in the criminal law"). The difficulty, however, is that, based upon the reasoning provided, there is no assurance that the General Assembly intended such middle ground to be achieved, and, indeed, much of the evidence not expressly taken into account by the Court simply is to the contrary. Thus, the appearance arises that the Court may be functioning as a lawmaker, rather than within its constitutional role as interpreter of the lawful enactments of the Legislature. This problem is compounded as it becomes increasingly apparent in various contexts that some form of strict liability is legislatively intended, for example, in instances in which *per se* methods of proof are employed. Ultimately, in light of the breadth of criminal offenses reposited in the Crimes Code and other statutes, I believe that the constitutional questions will need to be squarely confronted.

As I would hold that the General Assembly intended strict liability in the present case, no constitutional challenge is raised, and, on the facts as stated by the majority (and based upon his conviction for involuntary manslaughter), Appellant's moral blameworthiness can hardly be disputed, I believe that the trial court's instructions were sufficient.

Accordingly, I join in affirming the Superior Court's order.

NEWMAN, Justice, concurring and dissenting.

I respectfully disagree with the conclusion of the majority that criminal negligence is the *mens rea* for homicide by

vehicle while driving under the influence of alcohol, 75 Pa.C.S. § 3735. I believe that an examination of the legislative enactment of 75 Pa.C.S. § 3735.1, governing aggravated assault by vehicle while driving under the influence, and the recent amendment of the homicide by vehicle statute, 75 Pa.C.S. § 3732, demonstrates a legislative intent not to require proof of criminal negligence in order to sustain a conviction for 75 Pa.C.S. § 3735.

In *Commonwealth v. McCurdy*, 558 Pa. 65, 735 A.2d 681 (1999), we described 75 Pa.C.S. § 3735 as requiring proof: (1) of a conviction for driving under the influence pursuant to 75 Pa.C.S. § 3731, and (2) that this violation caused the death. *Id.* at 685. In the present case, the majority, relying on *Commonwealth v. Heck*, 517 Pa. 192, 535 A.2d 575 (1987), holds that *Heck's* questionable premise that the former 75 Pa.C.S. § 3732 required proof of criminal negligence, notwithstanding that statute's "unintentionally causes" language, controls this case. Consequently, because 75 Pa.C.S. § 3735 similarly penalizes a driver who "unintentionally causes" the death of another while driving under the influence, the majority engrafts onto *McCurdy's* two elements the requirement that the Commonwealth also prove that the defendant acted with criminal negligence.

As a matter of statutory construction, I believe the majority's position is incorrect. Section 3735 provides that "any person who unintentionally causes the death of another person as the result of a violation of section 3731 (relating to driving under the influence of alcohol or controlled substance) and is convicted of violating section 3731 is guilty of a felony of the second degree when the violation is the cause of death...." Noticeably absent from this definition is the word "negligence."

The absence of the term "negligence" is not a mere legislative oversight. As evidenced by the legislative amendments to 75 Pa.C.S. § 3732 and the enactment of 75 Pa.C.S. § 3735.1, when the legislature intends to require proof of criminal negligence for an offense, it puts the words in the statute. In 1996, the legislature enacted 75 Pa.C.S. § 3735.1, which creat-

ed a new criminal offense for "aggravated assault by vehicle while driving under the influence." Section 3735.1 provides:

> [a]ny person who *negligently* causes serious bodily injury to another person as the result of a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) and who is convicted of violating section 3731 commits a felony of the second degree when the violation is the cause of the injury.

75 Pa.C.S. § 3735.1(a) (emphasis added). The inclusion of the term "negligence" in this statute demonstrates a clear legislative intent to require proof of criminal negligence for a conviction. More tellingly, in December of 2000, the legislature amended the statute for homicide by vehicle, 75 Pa.C.S. § 3732.[1] Formerly, the statute read:

> [a]ny person who *unintentionally causes* the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic except section 3731 (relating to driving under the influence of alcohol or controlled substance) is guilty of homicide by vehicle, a misdemeanor of the first degree, when the violation is the cause of death.

Effective February 18, 2001, 75 Pa.C.S. § 3732 now provides:

> [a]ny person who *recklessly or with gross negligence* causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle · or to the regulation of traffic except section 3731 (relating to driving under influence of alcohol or controlled substance) is guilty of homicide by vehicle, a felony of the third degree, when the violation is the cause of death.

2000 Pa. Legis. Serv. Act 2000–108 (S.B.1312) (Purdon's) (emphasis added). The deletion of "unintentionally causes" from the former statute and its replacement with "recklessly or with gross negligence" further illustrates that when the legislature intends proof of criminal negligence as part of the

---

1. The statute at issue in *Heck, supra.*

elements of an offense, specifically in connection with violations of the Vehicle Code, it does so in clear and unmistakable language.

As a matter of statutory construction, therefore, we should not supply additional elements to a criminal offense where the legislature has not sought fit to include them in the statute. Respecting 75 Pa.C.S. § 3735, we should read the legislature's decision to leave this section unchanged as indicative of a legislative intent not to require proof of criminal negligence. If the legislature wished to require proof of criminal negligence to establish a violation of 75 Pa.C.S. § 3735, it could have done so either in 1996, when it enacted 75 Pa.C.S. § 3735.1 to require proof of negligence for aggravated assault by vehicle while driving under the influence, or in 2000, when it amended 75 Pa.C.S. § 3732 to require proof of criminal negligence for a conviction for homicide by vehicle. The legislature, however, made no such change.

I also find this Court's decision in *Heck* to be of doubtful utility to the present matter. If one reads *Heck* as involving only statutory interpretation, then I believe the actions of the legislature since *Heck* show that we erred in concluding that the definition of criminal negligence contained in the Crimes Code, 18 Pa.C.S. § 302(b)(4), must be read into the statute.[2] If, however, one reads *Heck* as holding that due process requires criminal negligence as the *mens rea* for a violation of the former 75 Pa.C.S. § 3732, then I would use the present case as an opportunity to disavow this interpretation of *Heck* as inconsistent with previous decisions upholding the constitutionality of 75 Pa.C.S. § 3732. *Cf. Commonwealth v. Hicks*, 502 Pa. 344, 466 A.2d 613 (1983) (rejecting equal protection challenge to former 75 Pa.C.S. § 3732); *Commonwealth v. Field*, 490 Pa. 519, 417 A.2d 160 (1980) (rejecting vagueness challenge to former 75 Pa.C.S. § 3732). *But cf. Commonwealth v. O'Hanlon*, 539 Pa. 478, 653 A.2d 616, 618 (1995)

---

2. Mr. Justice McDermott made this criticism in his Dissention Opinion in *Heck*, where he (correctly, I believe) accused the majority of "usurping the legislative power to define crimes" and noted that the "culpability requirement in [former Section 3732] is contained in the word 'unintentionally' ". 535 A.2d at 580.

(interpreting *Heck* as requiring, on due process grounds, proof of criminal negligence to sustain a conviction for violation of former 75 Pa.C.S. § 3732).  Due process does not mandate that criminal negligence be the *mens rea* for a crime for which the statute describes the degree of culpability as "unintentionally causes," and which otherwise clearly and adequately describes the prohibited conduct.  Accordingly, to the extent that the *Heck* opinion suggests this due process requirement and the majority follows this rationale with respect to 75 Pa.C.S. § 3735, I must disagree.

For these reasons, I concur in the decision of the majority to affirm but do not join its analysis of the *mens rea* requirement of 75 Pa.C.S. § 3735.

Justice CASTILLE joins this concurring and dissenting opinion.